**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CLAUDETTE GRIFFITH,

                *Plaintiff*,

     -against-

METROPOLITAN TRANSIT
AUTHORITY- NEW YORK CITY
TRANSIT, *and* JESSE WRIGHT SEDER,
*individually*.

                *Defendants*.

**Case No. 1:19-cv-06234**


**JURY TRIAL DEMANDED**

## <u>AMENDED COMPLAINT</u>

### NATURE OF ACTION

1.    Plaintiff Claudette Griffith ("Plaintiff"), by her attorneys, Crumiller P.C., brings

this action against the Metropolitan Transit Authority- New York City Transit Authority

("NYCTA") and Jesse Wright Seder (collectively, "Defendants") to remedy claims of race, sex

and age discrimination, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e

*et seq.* ("Title VII"); 42 U.S.C. § 1981 *et seq.*; the Age Discrimination and Employment Act,

29 U.S.C. § 621, et seq. ("ADEA"); the New York State Human Rights Law ("NYSHRL"), N.Y.

Exec. Law §§ 290 *et seq.*; and the New York City Human Rights Law ("NYCHRL"), N.Y.C.

Admin. Code § 8-101 *et seq.*.

### PARTIES

2.    Plaintiff Claudette Griffith is a natural person who is a black woman from

Trinidad, West Indies. She was born on July 9, 1958, and resides in New York City, County of

New York. Plaintiff was employed by Defendants from in or about October 2006 until her employment was constructively terminated on November 30, 2018.

3.      Defendant NYCTA is a New York City agency headquartered at 130 Livingston Street, Brooklyn, New York 11201.

4.      Defendant Jesse Wright Seder resides at 116 Goldenrod Avenue, Franklin Square, NY 11010.

## JURISDICTION AND VENUE

5.      This Court has original jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1343.  This Court has supplemental jurisdiction over Plaintiff's state and city law claims pursuant to 28 U.S.C. § 1367.

6.      Venue is proper in the Southern District of New York pursuant to 29 U.S.C. § 1391(b)(2).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

7.      On April 8, 2019, Plaintiff filed a timely Charge of Discrimination ("Charge") with the U.S. Equal Employment Opportunity Commission ("EEOC").

8.      That day, the EEOC voluntarily issued Plaintiff a Notice of Right to Sue, without being asked to do so by Plaintiff.

## LEGAL FRAMEWORK

9.      Under Title VII, it is an unlawful employment practice for an employer to "discharge any individual, or otherwise to discriminate against any individual" with respect to the terms, conditions, or privileges of employment, because of the employee's race or sex.  42 U.S.C. § 2000e-2(a)(1).

10.     42 U.S.C. § 1981 provides: "All persons within the jurisdiction of the

United States shall have the same right in every State and Territory to make and enforce

contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and

proceedings for the security of persons and property as is enjoyed by white citizens, and shall be

subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to

no other." 42 U.S.C. § 1981(a).

11.     The ADEA makes it unlawful for employers "to fail or refuse to hire or to

discharge any individual or otherwise discriminate against any individual with respect to

his compensation, terms, conditions, or privileges of employment, because of such individual's

age." 29 U.S.C. § 623.

12.     The NYSHRL provides that it shall be an unlawful discriminatory practice "to

discharge from employment . . . or to discriminate against such individual in compensation or in

terms, conditions or privileges of employment" on the basis of an individual's age, race or sex.

N.Y. Exec. Law § 296(1)(a).

13.     The NYCHRL similarly provides that it is unlawful for an employer to "discharge

from employment" any person, or to "discriminate against such person . . . in terms, conditions

or privileges of employment" on the basis of her age, race or sex.  N.Y.C. Admin. Code § 8-

107(1)(a)(2), (3).

## FACTUAL ALLEGATIONS

14.     Plaintiff began working for NYCTA in or about October 2006, as a Senior

Administrative Associate at the Central Maintenance Facility ("CMF") Office, which was then

located at 1700 Bushwick Avenue, Brooklyn NY 11207.

15.     In 2007, while working fulltime, Plaintiff went back to school part-time to earn her bachelor's degree, in order to be eligible for promotion to various other positions at NYCTA.

16.     Also, in 2007, the CMF facility moved to 48-05 Grand Avenue, Queens, New York 11378.

17.     In 2009, Plaintiff graduated from Nyack College with a Bachelor of Science.

18.     In July 2011, Plaintiff was promoted to the position of Staff Analyst II at NYCTA.

19.     In 2015, Plaintiff was promoted to the position of Manager, Shop Administration at NYCTA.

**Disparate Treatment**

20.     Up through her promotion in 2015, Plaintiff had been widely recognized as an excellent employee.  It was no surprise when she was promoted to Manager as she was extremely competent and enjoyed rapport with her colleagues and direct reports alike.

21.     In her position as Manager, Shop Administration, in 2015 Plaintiff began working under the supervision of Defendant Jesse Wright Seder ("Defendant Seder"), a substantially younger white male to whom she reported directly.

22.     What had previously been a positive work environment transformed dramatically for the worse under the supervision of Defendant Seder, who immediately began singling Plaintiff out for negative treatment as compared to her white male colleagues.

23.     In her position as Manager, Shop Administration, Plaintiff managed four Timekeepers and four Staff Analysts, and was also responsible for managing and processing payroll for more than 800 hourly NYCTA employees and 80 NYCTA supervisory managers.

24.     While all the prior CMF Managers in the history of Plaintiff's employment with the NYCTA each had a Staff Analyst assigned specifically to assist them, Plaintiff did not. Plaintiff interviewed numerous candidates for this position, and while many of them were hired by NYCTA as Staff Analysts, Defendant Seder refused to assign Plaintiff a Staff Analyst. Instead, Defendant Seder reassigned them all to other departments upon their hiring and did not assign any of them to assist Plaintiff in her managerial duties. For the remainder of her employment at NYCTA, Plaintiff had no choice but to perform her managerial duties without the assistance of an assigned Staff Analyst, unlike other similarly situated white and/or male managers. This made Plaintiff's job substantially more difficult and time consuming.  The difficulties presented by Plaintiff doing her job without a Staff Analyst caused her tremendous stress, which in turn caused sleeplessness and exacerbated her health issues, including asthma, high blood pressure, and pulmonary issues.

25.     On numerous occasions, Plaintiff asked Defendant Seder for what the NYCTA calls "Promotion in Place" – i.e., a salary increase without change of job title – to compensate for the amount of additional work she had to perform as a result of not having a Staff Analyst assigned to assist her.

26.     In response, Defendant Seder repeatedly told Plaintiff he had to craft a "vertical equity plan" with upper management in order to determine whether or not she was eligible for a Promotion in Place.  Upon information and belief, he never did so.  Plaintiff was never updated on whether she could participate in a "vertical equity plan," nor did she ever receive a Promotion in Place.

27.     Meanwhile, Joyce Rivera, a substantially younger, non-black Timekeeper reporting to Plaintiff, received at least two Promotions in Place, between 2017 and 2018.

5

28.     Defendant Seder also began grooming and promoting some of the white males under Plaintiff's supervision, including Staff Analysts John McNeilly, Paul Gunkle and Peter Miller ("Miller"), all of whom were of lesser seniority and less experienced than Plaintiff was, without any reasonable justification.

### First Demotion

29.     In 2017, Miller was promoted over Plaintiff, from under her supervision, to the new position of General Superintendent of Support Services in the CMF office.  Upon information and belief, this position was created by Defendant Seder especially for Miller; although General Superintendent positions at NYCTA are assigned to work at Bus Depots, Miller was permitted to remain at a CMF facility.

30.     Effectively, Miller's promotion to General Superintendent at the CMF facility meant that both Miller and Plaintiff were now both managers at that facility, whereas previously there had always been just one manager.  Moreover, as a General Superintendent at the CMF facility, Miller, who had less experience than Plaintiff and had previously reported to her, was now ostensibly her direct supervisor.

31.     Defendant Seder made it abundantly clear that he considered Miller, and not Plaintiff, to be the true manager of the CMF facility.  In or about fall 2017, Defendant Seder declared that, going forward, Miller, and not Plaintiff, would be in charge of the four Staff Analysts that Plaintiff had previously supervised, and that Plaintiff would only be in charge of the four Timekeepers. In other words, four out of Plaintiff's eight direct reports were removed from her supervision and reassigned to Miller's supervision, thereby decreasing her managerial responsibilities and increasing her workload exponentially.

32.     Defendant Seder typically visited the CMF facility once or twice a week.  On these visits, he ignored Plaintiff entirely, and went straight into Miller's office, without greeting or acknowledging Plaintiff in any way.

33.     Defendant Seder also excluded Plaintiff from management decisions and discussions between himself and Miller, thereby marginalizing Plaintiff and treating her as if only the two white men were the real managers of the CMF office.

34.     Defendant Seder, in concert with Miller, commenced a pattern of baseless criticisms of Plaintiff's job performance.  For instance, Defendant Seder harshly criticized Plaintiff on multiple occasions for her purported failure to "articulate an idea clearly," and for clearly manufactured purported misdeeds such as sitting separately from Defendant Seder or Miller at a meeting.

35.     Upon information and belief, Defendant Seder did not engage in such baseless criticisms of the performance of his white male colleagues.

36.     In 2017, Defendant Seder verbally committed that he would at last assign a Staff Analyst to Plaintiff.   Plaintiff again interviewed Staff Analysts to assist her in her managerial role and assist with her large workload.    However, after Faith Brown, one of the candidates interviewed by Plaintiff for a Staff Analyst position, was hired by NYCTA, Defendant Seder assigned her to assist Miller instead of Plaintiff.

37.     Over the next year, Defendant Seder continued to undermine Plaintiff's managerial authority.

38.     For example, or about October 4, 2017, various employees at the CMF facility complained that another employee, Sybil Perryman ("Perryman"), harassed and bullied them in the workplace.

39.     By email dated October 5, 2017, Plaintiff relayed this information to Defendant Seder, and stated that she would like to meet with Perryman about these accusations.

40.     By reply email, Defendant Seder reprimanded Plaintiff for suggesting such a meeting, which he said was unnecessary and would violate the confidentiality of employee "feedback."

41.     Bizarrely, by email dated December 13, 2017, Defendant Seder thereafter blamed Plaintiff for setting "a bad example" by "not speaking up" when Perryman had made a comment critiquing the color and font of an organizational chart at a meeting earlier that day.

42.     On or about March 29, 2018, per her job duties, Plaintiff was in the process of approving the timecards of the Timekeepers.  Plaintiff noticed that Timekeeper Teresa Gordon ("Gordon") had billed work hours for a day she was supposed to have off.  As an employee of integrity, Plaintiff did not want to approve payment for time not worked.  She therefore diplomatically asked Gordon via email if she had perhaps made an error in her billing.  Gordon did not respond to Plaintiff's question. Instead, later that day, Miller came into Plaintiff's office with Gordon and aggressively admonished Plaintiff that Gordon had been working on a "special assignment" which required her to work on some of her days off.  Neither Miller nor Defendant Seder had given Plaintiff prior notice of any such "special assignment," despite the fact that Plaintiff supervised Gordon and the other timekeepers.  Miller's harsh and accusatory attitude was entirely unwarranted, as Plaintiff's diligence and commitment to accuracy would have been appreciated under any normal scenario.  Upon information and belief, Miller did not treat any of his white male colleagues in this unjustified manner.

## Second Demotion and Constructive Discharge

43.     On or about October 9, 2018 at approximately 1:40 PM, Miller entered Plaintiff's office and closed the door. He then handed Plaintiff a sheet of paper that read "Manager Shop Administration – Location: Bronx (Zerega)" and instructed her to begin reporting to the Zerega Avenue facility in the Bronx, instead of the CMF facility in Queens, starting December 3, 2018. This transfer, a unilateral, material change to the terms of Plaintiff's employment posed a severe hardship to Plaintiff, in that it would double her commute time.  Plaintiff informed Miller of such, and he dismissed Plaintiff's concerns.

44.     Upon information and belief, the Zerega Avenue facility was widely known to be an undesirable work location to which NYCTA employees were typically transferred if they were having disciplinary issues, as a punitive measure.

45.     The document Miller handed to Plaintiff also listed further substantially diminished job duties.  According to the document, Plaintiff's job duties had been changed to those of a Staff Analyst, rather than a manager.  Miller also informed Plaintiff that she would no longer oversee the Timekeepers – i.e., her only remaining direct reports – and that, instead, Miller would now oversee the Timekeepers. Effectively, Plaintiff was being stripped of all supervisory authority, and demoted from Manager to Staff Analyst, albeit without the official change in title.

46.     Even though Plaintiff's transfer to this lesser role, at a remote and undesirable location, did not purportedly become effective until December 3, 2018, Defendant Seder began excluding Plaintiff from emails to her own staff in October, as if she were already gone from the CMF facility, and as if she had already ceased to supervise her staff.

47.    On or about October 16, 2018, Miller e-mailed Plaintiff a copy of the document presented to her on October 9, 2018, informing her of her demotion.

48.    On or about October 26, 2018, Plaintiff complained to Defendant Seder's supervisor, Chief Office Frank Annicaro ("Annicaro") as white males about her impending demotion and the unjustified punitive transfer.  She explained to Annicaro that the transfer would make her commute to work especially long and onerous. In response, Annicaro told Plaintiff that Defendant Seder could do "whatever he wanted to do" regarding her employment.

49.    The demotion in responsibilities, along with the transfer to an objectively undesirable location, and the installation of white male supervisors (who by any objective measure Plaintiff should have been supervising, and not vice versa) amounted to an intolerable change in working conditions that was unremediated after she complained and left Plaintiff no choice but to tender her resignation.

**The Effect on Plaintiff**

50.    As a result of Plaintiff's constructive discharge, her annual income plummeted from her previous salary of $88,108.10 to her pension of $14,919.72.

51.    Further, Plaintiff cannot collect Social Security yet because she is 60 years old as of this writing; moreover, when she is eligible for Social Security, her benefits will be adversely affected by the constructive termination

52.    Additionally, Plaintiff's constructive discharge and the disparate treatment that precipitated it have had a significant psychological and physical impact on Plaintiff.  Plaintiff has frequent sleep disturbances, anxiety, headaches, stress-induced colitis, high blood pressure and difficulty breathing.

## FIRST CAUSE OF ACTION:
### Discrimination in Violation of Title VII
### *Against NYCTA*

53.     Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

54.     Defendants unlawfully discriminated against Plaintiff in the terms and conditions of her employment, demoted her and unlawfully terminated her employment through constructive discharge, on the basis of her sex and race, in violation of Title VII.

55.     Defendants' discriminatory acts caused Plaintiff to suffer economic damages, including lost wages, commissions, and benefits, as well as emotional and physical distress.

56.     Defendants acted with malice and/or reckless indifference to Plaintiff's rights, entitling her to an award of punitive damages.

57.     Therefore, Defendants are jointly and severally liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, costs and disbursements.

## SECOND CAUSE OF ACTION:
### Discrimination in Violation of the 42 U.S.C. § 1981
### *Against All Defendants*

58.     Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

59.     Defendants unlawfully discriminated against Plaintiff in the terms and conditions of her employment, demoted her and unlawfully terminated her employment through constructive discharge, on the basis of her race in violation of 42 U.S.C. § 1981.

60.     Defendants' discriminatory acts caused Plaintiff to suffer economic damages, including lost wages, commissions, and benefits, as well as emotional and physical distress.

61.     Defendants acted with malice and/or reckless indifference to Plaintiff's rights, entitling her to an award of punitive damages.

62.     Therefore, Defendants are jointly and severally liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, costs and disbursements. Therefore, Defendants are jointly and severally liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, prejudgment interest, post-judgment interest, attorneys' fees, costs and disbursements.

### THIRD CAUSE OF ACTION:
**Discrimination in Violation of the ADEA**
***Against NYCTA***

63.     Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

64.     Defendants same discriminated against Plaintiff in the terms and conditions of her employment, demoted her and unlawfully terminated her employment through constructive discharge, on the basis of age in violation of ADEA.

65.     Defendants' discriminatory acts caused Plaintiff to suffer economic damages, including lost wages, commissions, and benefits, as well as emotional and physical distress.

66.     Defendants acted with malice and/or reckless indifference to Plaintiff's rights, entitling her to an award of punitive damages.

67.     Therefore, Defendants are jointly and severally liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, costs and disbursements. Therefore, Defendants are jointly and severally liable to Plaintiff for back pay, front pay, emotional distress and other

compensatory damages, prejudgment interest, post-judgment interest, attorneys' fees, costs and disbursements.

## FOURTH CAUSE OF ACTION:
### Discrimination in Violation of the NYSHRL
### *Against All Defendants*

68.     Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

69.     Defendants unlawfully discriminated against Plaintiff in the terms and conditions of her employment, demoted her and unlawfully terminated her employment through constructive discharge, on the basis of her sex, race and age in violation of the NYSHRL.

70.     Defendants' discriminatory acts caused Plaintiff to suffer economic damages, including lost wages, commissions, and benefits, as well as emotional and physical distress.

71.     Defendants acted with malice and/or reckless indifference to Plaintiff's rights, entitling her to an award of punitive damages.

72.     Therefore, Defendants are jointly and severally liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, costs and disbursements. Therefore, Defendants are jointly and severally liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, prejudgment interest, post-judgment interest, attorneys' fees, costs and disbursements.

## FIFTH CAUSE OF ACTION:
### Discrimination in Violation of the NYCHRL
### *Against All Defendants*

73.     Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

74.    Defendants unlawfully discriminated against Plaintiff in the terms and conditions of her employment, demoted her and unlawfully terminated her employment through constructive discharge, on the basis of her sex, race and age in violation of the NYCHRL.

75.    Defendants' discriminatory acts caused Plaintiff to suffer economic damages, including lost wages, commissions, and benefits, as well as emotional and physical distress.

76.    Defendants acted with malice and/or reckless indifference to Plaintiff's rights, entitling her to an award of punitive damages.

77.    Therefore, Defendants are jointly and severally liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, costs and disbursements. Therefore, Defendants are jointly and severally liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, prejudgment interest, post-judgment interest, attorneys' fees, costs and disbursements.

## <u>DEMAND FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully requests that this this Court enter judgment that:

a)    Declares that the discriminatory actions, practices, and policies of Defendants as set forth above violated Title VII, 42 U.S.C. § 1981, the ADEA, the NYSHRL, the NYCHRL;

b)    awards monetary damages to Plaintiff to compensate her for the discrimination she experienced, including economic damages, and damages for emotional distress;

c)    awards Plaintiff punitive damages pursuant to Title VII and the NYCHRL;

d)    awards Plaintiff reasonable attorneys' fees and costs; and

e)    grants such other relief as this Court deems just and proper.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to FRCP § 38(b), Plaintiff demands a trial by jury.

Dated: New York, New York
      August 29, 2019

                       Respectfully submitted,

                       Crumiller P.C.

By:      /s/
                Chloe Liederman
                222 Broadway, 19th Floor
                New York, NY 10038
                (212) 390-8480
                cl@crumiller.com
                *Attorneys for Plaintiff*